**GARNAC GRAIN COMPANY, INC., Plaintiff,**

v.

**BOATMEN'S BANK & TRUST COMPANY OF KANSAS CITY, et al., Defendants.**

**No. 84–1002–CV–W–3.**

United States District Court,
W.D. Missouri, W.D.

Aug. 16, 1988.

Bryon J. Beck, Morrison, Hecker, Curtis, Kuder & Parrish, Corporate Woods, Overland Park, Kan., Paul T. Lyon, William R. Schlecht, Morrison, Hecker, Curtis, Kuder & Parrish, Kansas City, Mo., for plaintiff.

Joseph L. Hiersteiner, Edward E. Schmitt, John A. Vering, III, Dietrich, Davis, Dicus, Rowlands, Schmitt & Gorman, Kansas City, Mo., for Boatmen's Bank & Trust.

Kathryn A. Millison, Galveston, Tex., pro se.

Robert Raymond, Shughart Thomson & Kilroy, Kansas City, Mo., for Oskaloosa State Bank.

Karl Zobrist, Blackwell, Sanders, Matheny, Weary & Lombard, Kansas City, Mo., for defendant First Nat. Bank.

Douglas G. Waters, Chapman & Waters, Leavenworth, Kan.

## ORDER

ELMO B. HUNTER, Senior District Judge.

Currently before the Court is the summary judgment motion of Boatmen's Bank & Trust Company of Kansas City ("Boatmen's") and First National Bank of Kansas City, Missouri, ("First National") against the State Bank of Oskaloosa ("Oskaloosa") and the summary judgment motion of Oskaloosa against Boatmen's and First National.

For the reasons stated below, Boatmen's and First National's motion will be granted in part and denied in part and Oskaloosa's motion will be denied.

### I.

This lawsuit arises out of an embezzlement perpetrated against plaintiff Garnac Grain Co., Inc. ("Garnac") by one of its employees, Kathryn A. Millison. Millison was employed by Garnac Grain from July, 1973, until September, 1982. She began embezzling money from the company in early 1976.

When Millison applied for her job at Garnac in 1973, she was residing in a halfway house in Kansas City, Missouri, following her release from a federal prison in Alderson, West Virginia. Her imprisonment was a result of her plea of guilty to seven counts of interstate transportation of falsely made, forged, altered and counterfeited bank checks in the United States District Court for the Western District of Virginia, Roanoke Division. *United States v. Millison,* Case No. 72–CR–2–L (W.D.Va.). In the early 1950's, she was also convicted of larceny after trust and forging checks. During the job interview, she stated that she had been imprisoned for possession of marijuana. There is nothing in the record which indicates Garnac was aware of the real reason for her incarceration or of her two previous convictions.

Millison's duties at Garnac included processing invoices from barge freight vendors for debts owed to them by Garnac for transporting grain by river barge. She would verify the amount due and request that checks be issued to the vendors. While Millison was not authorized to sign Garnac's checks, fully executed checks to barge freight vendors were sometimes returned to her and she was authorized to hold them until it was determined that they should be mailed to the vendors. She was also responsible for responding to inquiries from barge freight vendors regarding their invoices.

Millison employed two different schemes to carry out the embezzlement: "the stolen check scheme" and "the altered check scheme." In the stolen check scheme, she would obtain blank Garnac checks, forge the two drawers' signatures, and make the checks payable to her husband, L.R. Millison. The stolen checks would be made out in the same amount as valid checks to barge freight vendors that she had in her possession. Millison would not mail the valid check to the vendor, but would deposit the stolen checks in a joint account held by her and her husband at either Oskaloosa, Mark Twain Plaza Bank, ("Mark Twain") or Mutual Savings Association ("Mutual Savings"). The stolen checks were presented to Boatmen's Bank for pay-

ment through First National and were paid. All the stolen checks were regularly returned to Garnac in the company's monthly statement, but were removed and destroyed by Millison after she replaced them with the corresponding valid checks. Millison discontinued the forged check scheme in June or July of 1978 after it came to the attention of Garnac's management that certain checks were missing.

In the altered check scheme, Millison would take home fully executed and valid checks payable to barge freight vendors and type "or L.R. Millison" under the named payee with her manual typewriter. She would then endorse the check "L.R. Millison" on the back and deposit the check in one of the joint accounts she and her husband maintained at Oskaloosa, Mutual Savings, or Mark Twain banks. The altered checks were presented for payment to Boatmen's through First National and were paid. Millison would then intercept Garnac's monthly statements both before and, on a few occasions, after the statements had been opened by another Garnac employee. She would then take the statements home where she would remove the altered checks and obliterate the "or L.R. Millison" on the face of the checks and the "L.R. Millison" endorsement on the back.

Garnac first reported to Boatmen's that Millison had embezzled money from its account on September 9, 1982. In April, 1983, Millison was convicted in the United States District Court for the District of Kansas on charges relating to her embezzlement from Garnac. *United States v. Millison,* Case No. 82–20069–01 (D.Kan. 1983).

Garnac filed the above-styled action against Boatmen's on September 21, 1984, alleging that the altered and stolen checks were wrongfully paid. Boatmen's filed third-party complaints against First National, Oskaloosa, Mark Twain, Mutual Savings, and Millison. Peat, Marwick, Mitchell & Company, Garnac's accountant during the relevant period, was brought in as a fourth party defendant by First National. North River Insurance Company ("North River") was brought in as a fifth party

defendant by Mutual Savings. Shortly before Garnac filed this action, it filed suit against Peat, Marwick, Mitchell & Company alleging that its negligence led to Millison's embezzlement. *Garnac Grain Co. v. James B. Judd,* Civ. No. 84–0708–CV–W–0–3–1 (W.D.Mo.). Boatmen's, First National, and Oskaloosa were brought into that lawsuit as third and fourth party defendants.

On July 21, 1986, the Honorable John W. Oliver issued an order which held, *inter alia,* that Garnac's claims were limited by the one year statute of limitations of Mo. Rev.Stat. § 400.4–406(4).[1] Therefore, Garnac's recovery was limited to those altered checks which were made available to it after September 9, 1981.[2] Judge Oliver's order also granted defendant's motion to transfer the case to the Honorable Ross T. Roberts, who was presiding over *Garnac Grain Co. v. Judd.* On February 2, 1987, due to the illness of Judge Roberts, both cases were transferred to the undersigned judge. On April 7, 1987, the Court entered an Order enforcing a settlement agreement which provided for dismissal of Mark Twain, Mutual Savings, and North River.

On July 28, 1987, Garnac, Boatmen's, and First National entered into a settlement agreement which provided that Garnac would dismiss its claims against Boatmen's in exchange for a payment of $450,000 by Boatmen's and $495,000 by First National. The settlement provided for dismissal of all claims in the instant lawsuit except for the U.C.C. breach of warranty claims made by Boatmen's and First National against Oskaloosa and the claims against Millison. In addition, it removed all claims by or against all of the banks in the companion case of *Garnac Grain Co. v. Judd.* The Court held the hearing regarding the proposed settlement on July 27, 1987, and entered an order the next day approving the release and settlement agreement. On August 6, 1987, the Court entered orders which dismissed the settled claims from both lawsuits.[3]

In their summary judgment motion, Boatmen's and First National contend that Oskaloosa breached the U.C.C. transfer warranties which it made to them when it sent the altered checks into the bank collection system for payment. They argue that there is no dispute that the checks which Millison deposited at Oskaloosa and which Oskaloosa passed on to Boatmen's through First National were materially altered. Given that, they contend that they are entitled to collect from Oskaloosa the entire amount each of them paid to Garnac pursuant to the settlement agreement. They also seek interest from August 6, 1987, the date the settlement drafts were exchanged, and attorney's fees incurred prior to the settlement.

In response to Boatmen's and First National's motion, Oskaloosa filed a cross motion for summary judgment as well as suggestions in opposition to their motion. Oskaloosa contends that it is entitled to summary judgment because the settlement between the other two banks and Garnac constituted a waiver or failure to assert valid U.C.C. defenses against Garnac which precludes any attempt by them to enforce Oskaloosa's warranties. If the alleged waiver does not entitle it to summary judgment, Oskaloosa argues that at least it precludes the granting of summary judgment on behalf of Boatmen's and First National. In addition, Oskaloosa argues that summary judgment cannot be granted in favor of Boatmen's and First National because there are numerous disputed facts with respect to the possible defenses that Boatmen's may have had against Garnac.

---

**1.** Further references to Missouri's version of the Uniform Commercial Code ("U.C.C.") will omit the Missouri statute chapter number (i.e., "400").

**2.** Because the "stolen check scheme" was discontinued by Millison in 1978, any claims involving checks from that scheme are barred by the statute of limitations as per Judge Oliver's Order.

**3.** When it became apparent to the Court that the parties were not going to enter into a settlement agreement in the *Garnac Grain Co. v. Judd* case, the Court set that case for trial. The trial date was, however, postponed at the request of the parties. Thereafter, the case was transferred to the Honorable Dean Whipple.

Oskaloosa further contends that the other banks are not entitled to indemnity because they have failed to show liability to Garnac. Furthermore, Oskaloosa argues that the other banks have not shown that the settlement is reasonable. Oskaloosa also argues that attorney's fees are not recoverable in an action such as this even if the other banks recover on their main claims.

## II.

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." The party seeking summary judgment must inform the Court of the basis for its motion and identify the portions of the pleadings, depositions, etc., which demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265, 274 (1986). The nonmoving party must then "go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' designate 'the specific facts showing there is a genuine issue for trial.'" *Id.* The Court must give the nonmovant "the benefit of every doubt and every favorable inference that may be drawn from the evidence." *Buford v. Tremayne*, 747 F.2d 445, 447 (8th Cir.1984). Summary judgment is not appropriate unless the moving party has established its right to judgment with such clarity that there remains no room for controversy and the nonmoving party is not entitled to recover under any discernable circumstances. *Keys v. Lutheran Family and Children Services of Missouri*, 668 F.2d 356, 357–58 (8th Cir.1981).

## III.

### A. *Breach of warranties*

Boatmen's and First National contend that Oskaloosa is liable for the amount of their settlement with Garnac because it breached the U.C.C. transfer warranties that it made to them when it sent the checks altered by Millison to First National for payment by Boatmen's. Specifically, they allege that Oskaloosa breached the good title material alterations and genuine signature warranties.

Section 4–207 provides in pertinent part:

(1) Each customer or collecting bank who obtains payment or acceptance of an item and each prior customer and collecting bank warrants to the payor bank or other payor who in good faith pay or accepts the item that

(a) he has a good title to the item or is authorized to obtain payment or acceptance on behalf of one who has a good title; and

(b) he has no knowledge that the signature of the maker or drawer is unauthorized ...; and

(c) the item has not been materially altered ...

(2) Each customer and collecting bank who transfers an item and receives a settlement or other consideration for it warrants to his transferee and to any subsequent collecting bank who takes the item in good faith that

(a) he has a good title to the item or is authorized to obtain payment or acceptance on behalf of one who has a good title and the transfer is otherwise rightful; and

(b) all signatures are genuine or authorized; and

(c) the item has not been mateially altered; ....

▮▮▮▮ Under this system, a payor bank in possession of a check containing, for example, a material alteration has the choice of bringing a warranty claim against the bank that transferred the check to it, any other intermediate collecting bank or the depositary bank.[5] If the payor bank brings the action against a bank other than

---

5. The depositary bank is the "first bank to which an item is transferred for collection." U.C.C. § 4–105(a). In other words, the bank

where a check is cashed. A depositary bank is also a collecting bank. *See* U.C.C. § 4–105(d).

the depositary bank, that bank can bring a claim against its transferor bank or any other previous collecting bank. As between the banks involved in the collection process, the liability for a materially altered check falls on the depositary bank. This is in accord with the loss allocation framework of Articles 3 and 4 of the U.C.C. which generally places the loss of a forged or altered item on the person or bank who dealt with the wrongdoer if the wrongdoer cannot be found or is judgment proof.

With respect to the Garnac checks in question, Boatmen's is the payor bank and First National and Oskaloosa are collecting banks.[6] *See* U.C.C. § 4–105(b) and (d). Therefore, Oskaloosa and First National made section 4–207(1) warranties to Boatmen's. Section 4–207(2) warranties were made by Oskaloosa to First National and by First National to Boatmen's.

■ Since there is no knowledge or notice requirement with respect to the material alteration warranties, the question of whether or not a party breached these warranties is simply a question of whether or not the checks were materially altered.

■ There seems to be no serious dispute among the parties but that the alterations made by Millison were material. Each check in question was drawn on Garnac's account at Boatmen's, was properly made out to barge freight vendors and was properly signed by authorized representatives of Garnac. Millison altered the

checks by typing "or R.L. Millison" underneath the payee's name. The parties admitted that the alterations were material in stipulations filed earlier in the case. *See* Amended Stipulations, Section I, Part One, Paragraph 16 (filed February 24, 1986).[7] In any event, the Court finds that, as a matter of law, an alteration which adds an alternative payee to a check is a material alteration as that term is used in the U.C.C. *See* U.C.C. § 3–407.[8] Thus, both Oskaloosa and First National breached their 4–207(1) warranties of no material alteration to Boatmen's; Oskaloosa breached its 4–207(2) warranty of no material alterations to First National; and First National breached its 4–207(2) warranty of no material alterations to Boatmen's.

■ There is also no question that Oskaloosa breached its warranty of good title. Without the endorsement of the intended payees on the checks (i.e., the barge freight vendors) Oskaloosa could not obtain good title to the checks. The only endorsement on the back of the checks was "L.R. Millison." Neither Millison nor her husband was authorized to endorse the checks on behalf of the barge freight vendors shown as payees on the altered checks. *See* Amended Stipulations, Section I, Part One, Paragraph 17. Since Oskaloosa did not have good title when it transferred the checks to First National, it breached its section 4–207(1)(a) warranty to Boatmen's and its 4–207(2)(a) warranty to First Na-

---

**6.** Boatmen's was also the drawee of the altered checks. It will sometimes be referred to below as the drawee/payor bank.

**7.** The stipulations were prepared by the parties to aid Judge Oliver in deciding the proper period of limitations to be used in this case and to assist ruling Garnac Grain's partial motion for summary judgment. The stipulations were divided into two sections. Section I applied to the statute of limitations issue and Section II applied only to Garnac's motion for partial summary judgment. With respect to the latter, the parties went to great pains to limit the applicability of the stipulations to only the Court's ruling on that motion for partial summary judgment. No such effort was made with respect to the former set, which contains the stipulation that the "alterations committed by Millison

were material within the meaning of sections 3–407(1) and 4–207(1)(c) of the Missouri Uniform Commercial Code."

**8.** Section 3–407 provides in pertinent part:
    (1) any alteration of an instrument is material which changes the contract of any party thereto in any respect including any such change in
        (a) *the number* or relations *of parties;* or
        (b) an incomplete instrument, by completing it otherwise than as authorized; or
        (c) *the writing as signed, by adding to it* or by removing any part of it.
(emphasis added). The commentary following this section states that "[t]he addition of the name of an alternative payee is material." U.C.C. § 3–407 Comment 1.

tional.[9]  *See Riggs National Bank of Washington D.C. v. Security Bank, N.A.,* 10 U.C.C.Rep.Serv. 460, 462 (D.C.Sup.Ct. 1972).

Oskaloosa did not, however, breach its section 4–207(2)(b) warranty to First National that all signatures were genuine or authorized. Millison was permitted to endorse her husband's name on checks made payable to him. *See* Amended Stipulations, Section I, Part One, Paragraph 18. Therefore, this warranty was not breached.

While there is no question but that Oskaloosa breached its warranties of good title and no material alterations, its liability to them cannot be established without determining whether or not it can avail itself of any defenses. This will be discussed below.

### B. *Boatmen's Duty to Raise Defenses*

(1) Section 4–406 defense.

Section 4–406 provides in relevant part:

(1) When a bank sends to its customer a statement of account accompanied by items paid in good faith in support of the debit entries or holds the statement and items pursuant to a request or instructions of its customer or otherwise in a reasonable manner makes the statement and items available to the customer, the customer must exercise reasonable care and promptness to examine the statement and items to discover his unauthorized signature or any alteration on an item and must notify the bank promptly after a discovery thereof.

(2) If the bank establishes that the customer failed with respect to an item to comply with the duties imposed on the customer by subsection (1) the customer is precluded from asserting against the bank

(a) his unauthorized signature or any alteration on the item if the bank also establishes that it suffered a loss by reason of such failure; and

(b) an unauthorized signature or alteration by the same wrongdoer on any other item paid in good faith by the bank after the first item and statement was available to the customer for a reasonable period not exceeding fourteen calendar days and before the bank receives notification from the customer of any such unauthorized signature or alteration.

(3) The preclusion under subsection (2) does not apply if the customer establishes lack of ordinary care on the part of the bank in paying the items.

■ Thus, Boatmen's would have a valid defense against Garnac's claim that it wrongfully paid the checks altered by Millison if Boatmen's could show that Garnac failed to exercise reasonable care and promptness in examining its monthly bank statements to discover the alterations.[10] However, this defense is not available if Garnac could show that Boatmen's failed to use ordinary care in paying the altered checks.

Section 4–406(5) states:

If under this section a payor bank has a valid defense against a claim of a customer upon or resulting from payment of an item and waives or fails upon request to assert the defense the bank may not assert against any collecting bank or other prior party presenting or transferring the item a claim based upon the unauthorized signature or alteration giving rise to the customer's claim.

■ Thus, the U.C.C. explicitly requires Boatmen's to raise any section 4–406 defense it might have against Garnac as a prerequisite to bringing a claim against a

---

**9.** First National, of course, breached the warranty of good title it gave to Boatmen's.

**10.** Section 4–406 and section 3–406 both provide defenses to breach of warranty of good title claims where, as is true here, the lack of good title arises out of a material alteration or unauthorized signature. This is because, when applicable, they each prevent the alterations or unauthorized signatures from being asserted, so if

the lack of good title claim can only be shown by proving the alteration or signature then the claim will fail. The discussion of sections 3–406 and 4–406 below will focus on the warranty of no material alterations even though both defenses, if valid, will apply with equal force in this situation to bar recovery for breach of the warranty of good title.

collecting bank on the altered checks. Boatmen's did raise and pursue section 4–406 defenses against Garnac up until the time of the settlement. Therefore, the Court must determine what effect a settlement has on Boatmen's 4–406(5) duty. This will be examined in Section III.C. below.

### (2) Section 3–406 defense.

Section 3–406 provides:

Any person who by his negligence substantially contributes to a material alteration of the instrument or to the making of an unauthorized signature is precluded from asserting the alteration or lack of authority against a holder in due course or against a drawee or other payor who pays the instrument in good faith and in accordance with the reasonable commercial standards of the drawee's or payor's business.

If Garnac's negligence substantially contributed to Millison's material alterations of the checks, then it would be precluded by section 3–406 from asserting the alterations against Boatmen's. However, like the section 4–406 defense, it is not available to Boatmen's unless Boatmen's paid the checks in good faith and in accordance with reasonable commercial standards.

Boatmen's and First National argue that Boatmen's did not have an obligation to raise any section 3–406 defense it might have had against Garnac as a prerequisite to bringing an action against Oskaloosa for a breach of its warranties.[11] Oskaloosa contends that section 4–406(5) and common law indemnity principles require Boatmen's to pursue possible section 3–406 defenses before it can collect from Oskaloosa for any breach of its warranty of no material alterations.

■ Oskaloosa's argument that section 4–406(5) requires a payor bank to raise 3–406 defenses is not well taken. Subsection (5) of 4–406 explicitly states that it only applies "if *under this section* a payor bank has a valid defense." (emphasis added). While the Court believes that this language and its intended meaning is perfectly clear, any possible uncertainty is laid to rest by comment 7 which follows section 4–406. It states that "[a]lthough the principles of subsection (5) might well be applied to other types of claims of customers against banks and defenses to these claims, the rule of the subsection is limited to defenses of the payor bank under this section. No present need is known to give the rule wider effect." U.C.C. § 4–406, comment 7. Virtually every court which has been presented with this question has held that section 4–406(5) does not require the payor bank to raise possible section 3–406 defenses. *See First National Bank of Arizona v. Plymouth–Home National Bank,* 553 F.Supp. 448, 452–53 (D.Mass.1982), *aff'd,* 705 F.2d 439 (1st Cir.1983); *Girard Bank v. Mount Holly State Bank,* 474 F.Supp. 1225, 1234–36 (D.N.J.1979); *Mellon National Bank & Trust Co. v. Merchants Bank of New York,* 15 U.C.C.Rep. Serv. 691, 693–94 (S.D.N.Y.1972); *Clarkson v. Selected Risk Insurance Co.,* 170 N.J.Super. 373, 406 A.2d 494, 500 (Law Div.1979); *Long Island Trust Co. v. National Bank of North America,* 28 U.C.C. Rep.Serv. 1442, 1444–46 (N.Y.Sup.Ct.1980). The one opinion which found a duty on the part of drawee banks to raise section 3–406 defenses, *Canadian and Imperial Bank of Commerce v. Federal Reserve Bank of New York,* 8 U.C.C.Rep.Serv. 365 (N.Y. Sup.Ct.1970), has been expressly rejected by other courts examining this question and is not persuasive to this Court. *Mellon National Bank & Trust Co.,* 15 U.C.C. Rep.Serv. at 694; *Clarkson,* 406 A.2d at 499.[12] Section 4–406 shows a strong policy choice on the part of the drafters of the

---

11. In addition, Boatmen's argues that it raised and vigorously pursued each and every possible defense it had against Garnac's claims, including a possible 3–406 defense, up until the time of settlement.

12. It has been suggested that *Stone and Webster Engineering Corporation v. First National Bank*

*& Trust Co. of Greenfield,* 345 Mass. 1, 184 N.E.2d 358 (1962) might support Oskaloosa's position on this issue. However, the Court does not read that case in such a manner and, in any event, the portion of the opinion which could be so read is mere dicta.

U.C.C. to encourage bank customers to promptly examine their statements in order to discover forgeries and alterations. Subsection (5) furthers this goal by forcing drawee banks to pursue such valid defenses against their customer as a prerequisite to asserting warranty claims against collecting banks for losses caused by alterations or forgeries. *Mellon National Bank & Trust Co.*, 15 U.C.C.Rep.Serv. at 693. Applying section 406(5) to section 3–406 would not promote this goal.

Furthermore, an earlier proposed draft of the Uniform Commercial Code included a provision similar to section 4–406(5) in section 4–207, the effect of which would have been to require drawee banks to raise both 4–406 and 3–406 defenses before asserting claims for breach of warranty against collecting banks. *See* Supplement No. 1 (1955) to the 1952 Official Draft of Text and Comments of the Uniform Commercial Code, p. 31. The fact that this proposed section was removed and section 4–406(5) was included in the final version of Article 4 adopted by Missouri is very persuasive evidence that the drafters of the U.C.C. considered, but later rejected, requiring drawee banks to raise possible 3–406 defenses before bringing breach of warranty actions against collecting banks. *See Girard Bank*, 474 F.Supp. at 1236; *Mellon*

*State Bank & Trust Co.*, 155 U.C.C.Rep. Serv. at 693–94.

The Court is not unmindful of the fact that the decision by the drafters of the Uniform Commercial Code to not require drawee banks to pursue valid section 3–406 defenses when the drawer negligently contributes to the forgery or alteration can, in some instances, provide for arbitrary and unjust results. For example, a bank could very well choose to recredit the account of its negligent customer and look to the innocent or relatively innocent collecting bank for payment. While that did not happen in this case, it certainly could and, if it did it, it could very well generate an unjust result. However, the statute is clear and it is not within the province of this court to rewrite it.[13]

■ Oskaloosa also argues that under common law indemnity principles an indemnitee cannot recover from the indemnitor if he has a valid defense to the claim which he is seeking indemnity. This is, as a general principle, a valid statement of the law. However, this is not a common law indemnity action, but a U.C.C. warranty action and, as discussed above, the U.C.C. does not require a drawee bank to raise 3–406 defenses as a prerequisite to bringing a warranty claim.[14] Therefore, this argument also fails.

13. Any unjustness which may be present in this case is tempered by the fact that Garnac's and Boatmen's conduct regarding the altered checks can still be addressed via section 4–406. Admittedly, section 3–406 is broader and reaches more of Garnac's alleged negligence than section 4–406 (*e.g.*, it covers negligent hire and supervision of Millison). However, with respect to Boatmen's negligence, the phrases "ordinary care" and "reasonable commercial standards" are so similar that it is almost inconceivable that a jury would find that Boatmen's conduct was sufficient under one section and not under the other.

14. Throughout its suggestions in opposition to the other banks' motion for summary judgment, Oskaloosa argues that common law indemnity principles insulate it from liability to the other banks on its warranties. These arguments are without merit. For example, Oskaloosa argues that the other banks are not entitled to recovery because they have failed to show their liability to Garnac. While an explicit showing of liability may be required under common law indem-

nity principles, it is not here. Ignoring for a moment the question of Boatmen's possible section 4–406 defenses against Garnac, which will be discussed below, all Boatmen's or First National are required to show under section 4–207 is a breach of the warranty and damages. Likewise, Oskaloosa complains that Boatmen's and First National have failed to plead their own negligence or liability and therefore, "they cannot now successfully assert a right to indemnity." In support of this Oskaloosa cites to the case of *Mid-Continent News Co. v. Ford Motor Co.*, 671 S.W.2d 796 (Mo.Ct.App.1984), a common law indemnity case which holds that in order to properly plead a claim for indemnity or contribution, the person seeking indemnity must allege his own liability. In this action, Boatmen's and First National have properly plead their warranty claims. Moreover, if Oskaloosa's argument was the law, a drawee/payor bank would be forced to either admit liability to the drawer in order to preserve its warranty claim against collecting banks or to wait until after it is completely litigated the issue with its customer and received an adverse judgment be-

■ Since Boatmen's had no duty to raise a section 3–406 defense against Garnac as a prerequisite to bringing a breach of warranty action against Oskaloosa, it certainly cannot be faulted for raising such defenses against Garnac and then settling the claim with Garnac short of trial.

### (3) "Bad Faith" Defense.

Oskaloosa also argues that Boatmen's had a duty to raise and litigate the question of whether or not Garnac acted in bad faith with respect to Millison's embezzlement.[15] It contends that a finding of bad faith can override the general rules of loss allocation set forth in Articles 3 and 4 of the U.C.C. One case cited to support this proposition, *Western Casualty & Surety Co. v. Citizens Bank of Las Cruces*, 676 F.2d 1344, 1347 (10th Cir.1982), does not do so. The other, *E.F. Hutton & Co. v. City National Bank*, 149 Cal.App.3d 60, 196 Cal.Rptr. 614 (1983), merely states:

> A collecting bank or any other person seeking to use [section 3–305] must comply with the standards of conduct imposed by the Uniform Commercial Code. These standards are violated if the bank did not act in good faith in handling the transaction (see § 1203) ...

*Id.* at 622. This is just a statement of the general rule of section 1–203 that "every contract or *duty* within this Chapter imposes an obligation of good faith in its performance or enforcement." (emphasis added). While no Missouri case on this point has been presented to or found by the Court, the Court will presume without deciding that a failure to act in good faith in

performing a U.C.C. duty could change the general rules of loss allocation set forth in Articles 3 and 4 of the U.C.C.[16]

Since, as noted above, there was no duty on the part of Boatmen's to raise section 3–406 defenses, this "lack of good faith" defense would not apply there. However, as to Boatmen's duty to raise section 4–406 defenses and any other duties of Boatmen's, First National or Garnac, the parties had an obligation to perform them in good faith. Section 1–207 defines good faith as "honesty in fact in the conduct or transaction concerned." That is all that is required. A party can act in a completely unreasonable manner, but as long as his actions are "honest in fact" he has acted in good faith. *Rigby Corp. v. Boatmen's Bank & Trust Co.*, 713 S.W.2d 517, 527 (Mo.Ct.App.1986). The Court has not seen even a hint of evidence showing lack of good faith on the part of Garnac or any of the other parties involved in this lawsuit. Therefore, before the Court will allow Oskaloosa to raise a lack of good faith defense at trial, it must make a proffer to the court of the evidence which it contends shows that Garnac or the other two banks actions were not honest in fact.[17]

### C. *Effect of Settlement*

Oskaloosa contends that the settlement between the other banks and Garnac constituted a waiver or failure to assert valid defenses against Garnac and that under 4–406(5) this forecloses their ability to assert breach of warranty claims against Oskaloosa.

---

fore asserting its warranty claims against the collecting banks. Neither of these options is very attractive to the drawee/payor bank. In addition, the Court notes that much of Oskaloosa's arguments regarding common law indemnity principles are basically irrelevant because the Court's ruling, *infra*, will allow Oskaloosa the opportunity to litigate whether or not Boatmen's had a valid 4–406 defense, which is the only defense that Boatmen's was required to raise and pursue as a prerequisite to asserting breach of warranty claims against Oskaloosa.

15. As with the section 3–406 and 4–406 defenses, Boatmen's contends, and the Court recognizes, that it raised and pursued the question of Garnac's bad faith up until the time of settlement.

16. One could argue that a drawee bank is not required to raise a bad faith defense as a prerequisite to asserting a breach of warranty claim under the same analysis used above for 3–406 defenses. However, such a view would be shortsighted in light of the fact that a duty of good faith is imposed on all transactions under the Uniform Commercial Code.

17. Since no Missouri court authority was found which allowed the loss allocation rules of Articles 3 and 4 to be changed because a party failed to perform a duty in good faith, the Court will require more briefing on this point if Oskaloosa intends to pursue this defense.

■ As noted above, Boatmen's did raise section 4-406 and other defenses against Garnac. In fact, Boatmen's vigorously pursued all of those defenses up until the date of settlement. Thus, the real question is whether or not drawee/payor banks are required to completely litigate potentially valid 4-406 defenses through trial and appeal. In other words, does the settlement by the drawee/payor bank with its customer when a 4-406 defense is potentially available to it constitute a waiver of its right to look to collecting banks for payment on breached warranties. The Court does not believe that section 4-406(5) allows for, much less requires, such a result.

There is an extremely strong policy in Missouri favoring settlement of lawsuits prior to trial. *See Sanger v. Yellow Cab Co.*, 486 S.W.2d 477, 480-81 (Mo.1972) (banc). Oskaloosa's argument would not only discourage settlements, it would completely foreclose them in situations such as this. Without the participation of the "upstream banks", no drawee/payor bank with a valid warranty claim against a prior collecting bank would ever enter into a settlement with its customer when it had even a colorable section 4-406 defense. Depositary banks would, in effect, have a veto over settlements between the other parties in the case. Given the strong policy favoring settlement agreements, the Court refuses to interpret the statute to reach such a result.

Of course, it would be an entirely different matter if there were any allegations or evidence that the settlement was made in bad faith. However, the contrary is true here. The Court held a hearing on the settlement agreement and, thereafter, held it was reasonable and entered into in good faith by the parties. *See* Order Approving Release and Settlement, Civ. Nos. 84-0708-CV-W-1-3 and 84-1002-CV-W-0-3 (July 28, 1987). The altered checks at issue totaled $1,420,291.18. Garnac's total claim, including interest, was well over $2 million. The settlement amount of $945,000 was entirely reasonable given the banks' potential exposure in the case. In fact, the settlement limited Oskaloosa's maximum exposure in the event that it is ultimately found liable for the breach of warranties.

■ While the settlement does not foreclose Boatmen's and First National's ability to assert breach of warranty claims against Oskaloosa, the Court does not accept their position that it precludes Oskaloosa from taking advantage of possibly valid section 4-406 defenses. Such a view would be contrary to the policy underlying section 4-406(5). As noted above, section 4-406 was intended to encourage bank customers to promptly and diligently examine their bank statements in order to discover forgeries and alterations. Subsection (5) was intended to promote this by not allowing banks to ignore a customer's failure to promptly examine its statements by collecting losses caused by forgeries and material alterations from the "upstream" banks. If a bank could short circuit the statute by suing its customer and then later settle before trial, the purpose of 4-406(5) would be defeated. A better view allows drawee/payor banks to settle with their customers while preserving the right of collecting banks to defend against a warranty action brought by the drawee/payor bank by showing a valid section 4-406 defense.

D. *Is Summary Judgment Appropriate on the Section 4-406 Defense?*

■ The next question which must be addressed is whether summary judgment can be granted on the issue of whether or not Boatmen's had a valid 4-406 defense against Garnac. As noted above, in order to determine whether the defense is available, there must be a finding of (1) whether or not the bank's customer exercised reasonable care and promptness in examining his bank statement to discover his unauthorized signature or any alteration and (2) whether or not the bank exercised ordinary care in paying the checks. After carefully examining the arguments of the parties and the relevant case law, the Court finds that there are sufficient genuine issues of material facts so as to preclude a granting of summary judgment on this issue.

The Court first notes that this same question was presented to Judge Oliver and he ruled on July 21, 1986, that summary judgment was not proper. At that time, it was Garnac who was seeking summary judgment on this issue. It presented the Court with the following evidence in support of its motion: (1) the altered checks themselves; (2) that the checks were made payable in the alternative to an individual and a company; (3) that the checks were then deposited in the individual's personal account with only the individual's endorsement; (4) some 28 different barge freight companies were alternative payees with L.R. Millison; (5) the checks ranged in amounts from $3,600 to $77,800; (6) the checks were deposited in a small bank in rural Kansas; (7) the type of alteration done by Millison could easily be done to virtually any commercial check; and (8) Oskaloosa tellers knew that both Kathryn and L.R. Millison were employed by Garnac at the time Millison was depositing the checks drawn on Garnac's account into her personal account.

The only additional evidence presented by the parties is (1) the deposition of Mr. William R. Mills, an expert in banking operations; (2) the affidavit of Mr. Burton V. McCullough, an expert in banking procedures; and (3) the affidavit of Mr. Larry C. Bowser, President of Oskaloosa. The portions of Mr. Mills' deposition presented to the Court showed that he was of the opinion that both Oskaloosa and Boatmen's failed to exercise ordinary care in processing the checks. McCullough and Bowser's affidavits essentially state that in their opinion Boatmen's conduct was commercially reasonable. This additional information further supports Judge Oliver's opinion that this issue is not a proper one to be ruled on a motion for summary judgment.[18]

The question of whether or not a party exercised ordinary care is ordinarily not the type of question which can be resolved on a motion for summary judgment. *See Gar-* *nac Grain Co., Inc. v. Boatmen's Bank & Trust Co. of Kansas City,* Civ. No. 84–1002–CV–W–1 (Order of July 21, 1986), p. 17 and cases cited therein. This case is no exception to the general rule. The Court is unable to rule as a matter of law that Boatmen's failed to exercise ordinary care in paying the altered checks. Boatmen's and First National cite to two cases where courts have granted summary judgments against banks in circumstances which they argue are almost identical to this case. *See Commonwealth Federal Savings & Loan Assoc. v. First National Bank of New Jersey,* 513 F.Supp. 296, 301–02 (E.D.Pa. 1979); *Morgan Guaranteed Trust Co. of New York v. Chase Manhattan Bank, N.A.,* 36 U.C.C.Rep.Serv. 584 (N.Y.Sup.Ct. 1983). Those cases do not persuade the Court that summary judgment on this issue is proper in this case.

### IV.

Boatmen's and First National contend that Oskaloosa is liable for the attorney' fees they incurred while defending against Garnac's claims.

Section 4–207(3) provides that damages for breach of warranties include "finance charges and expenses related to the item, if any." Comment 5 following section 4–207 states that "[t]he 'expenses' referred to in this phrase may be ordinary collecting expenses *and in appropriate cases could also include such expenses as attorney's fees.*" (emphasis added). The Eighth Circuit Court of Appeals, interpreting Missouri law, has held that a drawee/payor bank can collect the attorney's fees it incurred in defending a suit against its customer from a collecting bank, if the collecting bank breached a section 4–207 warranty. *Bagby v. Merrill Lynch, Pierce, Fenner & Smith, Inc.,* 491 F.2d 192, 198–200 (8th Cir.1974). Other courts have ruled similarly. *See Perkins State Bank v. Connolly,* 632 F.2d 1306, 1314–16 (5th Cir.

---

18. The doctrine of law of the case is discretionary and, in any event, does not apply to rulings on motions for partial summary judgment. *See, e.g., United States v. Horton,* 622 F.2d 144, 148 (5th Cir.1980). Therefore, the Court is not absolutely bound by Judge Oliver's ruling. However, this Court shows great deference to the ruling of brother judges, especially those involving the same issues in the same case.

1980); *Long Island Trust Co. v. National Bank of North America,* 28 U.C.C.Rep. Serv. 1442, 1446 (N.Y.Sup.Ct.1980). In *Bagby,* the Court held that a collecting bank that breached a section 4–207 warranty must pay the attorney's fees of the party it gave the warranty to if it had notice of the underlying lawsuit and an opportunity to defend *Bagby,* 491 F.2d at 193 n. 9. The Court further held that the liability was limited to attorney's fees incurred on the underlying lawsuit and not those expended enforcing the warranty against the collecting bank. *Id.*

Oskaloosa argues that Boatmen's and First National are not entitled to an award of attorney's fees because they did not tender their defense of Garnac's claims to Oskaloosa. While the bank in *Bagby* did, in fact, tender its defense to the collecting banks, the Court does not read that case as requiring a formal "tender of defense". Rather, all that is required is that the collecting bank have notice of the lawsuit and an opportunity to defend. On November 12, 1982, Mr. Robert R. Regnier, a senior vice president at Boatmen's, wrote the president of Oskaloosa and informed him of the altered checks and that Boatmen's would be making a claim against Oskaloosa under section 4–207 for any loss it suffered because of Oskaloosa's breach of U.C.C. warranties. Furthermore, Oskaloosa was brought into this lawsuit as a third party defendant by Boatmen's within two months after the case was filed. Thus, Oskaloosa had both notice of the suit and an opportunity to defend.

*Bagby* also holds that a collecting bank which breached a section 4–207 warranty is liable for attorney's fees even if the drawee/payor bank had a successful defense against the drawer. *Id.* at 199. *Bagby* involved a suit by a customer of a brokerage firm for the conversion and sale of certain common stock. The brokerage then brought a third party action against its drawee bank for conversion of the funds by paying checks over unauthorized or forged endorsements. The drawee bank then brought the fourth party action against two collecting banks for breach of their 4–207 warranty of good title. The claim between the plaintiff and the brokerage was settled prior to trial. At trial of the third party complaint, the court found for the drawee/payor bank on a 3–406 defense that the brokerage's negligence substantially contributed to the making of the unauthorized signatures. On the fourth party complaint, the district court awarded the drawee/payor bank attorney's fees from the two collecting banks. On appeal, the Eighth Circuit reversed the district court's decision on the third party complaint and entered judgment in favor of the brokerage. With regard to the award of the attorney's fees against the collecting banks on the fourth party complaint, the collecting banks argued that the district court was without power to make the attorney's fee award since no warranties had been breached under section 4–207. The Court of Appeals disagreed. It held that even though the drawee bank had been successful in the district court on its section 3–406 defense, the collecting banks had still breached their warranty of good title and were, therefore, still liable for attorney's fees under 4–207(3). The Court stated:

> Despite our disposition of the third party claim, suffice it to say that a finding of negligence necessary to preclude a drawer from recovery under section 3–406 does not apriorori mean that a drawee has obtained "good title" to the instrument(s) through the collection process, and that no "good title" warranty given by the collecting banks has been breached. Application of § 3–406 does not extinguish the drawer's rights against the drawee, but serves only to bar his remedy.

*Id.*

■ This same reasoning should apply with equal force to a defense under 4–406. Whether or not Oskaloosa is able to show that Boatmen's had a successful section 4–406 defense against Garnac and, thus

avoid liability on the altered checks, it is still, by reason of its breach of warranties, liable to Boatmen's and First National for the attorney's fees they incurred in defending the action brought by Garnac. Because there are no genuine issues of material fact on this issue and Boatmen's and First National are entitled to judgment as a matter of law, summary judgment is also proper on this issue.

First National states that it incurred $185,954.44 in attorney's fees and expenses related to the Garnac claims. Boatmen's claims attorney's fees and expenses totaling $230,225.90. However, before the Court can assess the amount of attorney's fees to be awarded, the parties must furnish the Court with a more detailed breakdown of the fees and expenses along with supporting affidavits which show that the specific fees and expenses were necessary and reasonable. Oskaloosa shall have an opportunity to respond to those documents. The Court will hold a hearing if it deems one necessary or if requested by the parties.

## V.

Oskaloosa contends that it is entitled to summary judgment because the other bank's settlement with Garnac constituted a waiver of their right to assert breach of warranty claims against Oskaloosa. This argument was addressed in section III.C. above and Oskaloosa's motion is denied for the reasons stated therein.

## VI.

The only issue remaining in this case is whether Boatmen's had a valid section 4–406 defense against Garnac. If it is proven that such a valid defense existed, Oskaloosa is relieved from paying any damages for breach of its section 4–207 warranties to Boatmen's and First National. If the defense was not present, Oskaloosa will be liable on its breach of warranties in the amount each bank paid Garnac in settlement of its claims plus interest.[19] Therefore, it will be necessary to hold a trial on the limited issue of the existence of a section 4–406 defense. The Court realizes that, as a practical matter, Oskaloosa will be required to raise and prove Garnac's negligence and Boatmen's and First National will be in the uncomfortable position of attempting to show that Boatmen's failed to exercise ordinary care in paying the altered checks. While this may, on the surface, seem somewhat unorthodox, it is the only just and fair solution in light of the statutes, case law, and policies which underly the above rulings.

Oskaloosa has filed a motion for leave to amend interrogatory answers regarding expert witnesses. It would like to name two expert witnesses who will testify on the "issue of the reasonableness of the actions of both the parties under the facts of this case." Given the effect of the settlement and this ruling on the positions of the parties and the issues remaining in this lawsuit, the Court believes that it would be in the interest of justice to allow the parties leave to name additional expert witnesses and to allow them an opportunity to conduct additional discovery. The parties will be granted a four week period, beginning on the date this Order is filed, within which to conduct discovery. Any party wishing to amend its interrogatory answers to add additional expert witnesses shall do so within the first two weeks of the four week

---

**19.** Section 4–207(3) provides that "[d]amages for breach of such warranties engagement to honor shall not exceed the consideration received by the customer collecting bank responsible plus finance charges and expenses related to the item, if any." Damages for breach of a warranty of no material alterations where the alteration involved an alternative payee and the real payee was never paid normally equal the amount the the check. But here since the settle-ment is less than the total amount of the checks, the damages equal the amount of the settlement. Thus, Boatmen's damages are $450,000 and First National's are $495,000. The banks are also entitled to interest from August 6, 1987, the date Garnac was paid, until the date trial is completed. *See Aetna Casualty & Surety Co. v. Traders National Bank & Trust Co.,* 514 S.W.2d 860, 867 (Mo.Ct.App.1974).

discovery period. The parties shall be prepared to go to trial during the Court's September–October, 1988 Accelerated Civil Docket.

It is therefore ORDERED that summary judgment be granted in favor of Boatmen's and against Oskaloosa on Boatmen's claim that Oskaloosa breached its section 4–207(1) warranty of no material alterations.

It is FURTHER ORDERED that summary judgment be granted in favor of Boatmen's and against Oskaloosa on Boatmen's claim that Oskaloosa breached its section 4–207(1)(a) warranty of good title.

It is FURTHER ORDERED that summary judgment be granted in favor of First National and against Oskaloosa on First National's claim that Oskaloosa breached its section 4–207(2)(c) warranty of no material alterations.

It is FURTHER ORDERED that summary judgment be granted in favor of First National and against Oskaloosa on First National's claim that Oskaloosa breached its section 4–207(2)(a) warranty of good title.

It is FURTHER ORDERED that summary judgment be granted in favor of Boatmen's and First National and against Oskaloosa on the issue of attorney's fees. Boatmen's and First National are ordered to present to the Court a detailed breakdown of the attorney's fees and expenses they are claiming, accompanied by supporting affidavits which show that the fees were reasonable and necessary to properly defend against the claims made by Garnac. Within two weeks after Boatmen's and First National file the above documentation, Oskaloosa shall file any opposition or comments it has to the fees requested.

It is FURTHER ORDERED that Boatmen's and Oskaloosa's joint motion for summary judgment be denied in each and every other respect, including the issue of whether or not Boatmen's had a valid section 4–406 defense to Garnac's claims, which is the sole issue remaining in this lawsuit.

It is FURTHER ORDERED that Oskaloosa's motion for summary judgment is DENIED.

IT IS SO ORDERED.